NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| Bernard WURTZBACHER, | : |
|  | : |
| Plaintiff, | :  Civil No. 17-05026 (RBK/JS) |
| v. | : |
|  | :  **OPINION** |
| WINSLOW TOWNSHIP, *et al.*, | : |
|  | : |
| Defendants. | : |
|  | : |

**KUGLER**, United States District Judge:

This matter is before the Court on the summary judgment motion (Doc. No. 22) of Winslow Township, former Chief of Police Robert Stimelski, and Winslow Township Police Officers Robert Gauntt, James Rausch, and Justin Valentino (collectively, "Defendants"). For the reasons below, Defendants' motion is **GRANTED** as to Plaintiff's claims under 42 U.S.C. § 1983 ("Section 1983") and the New Jersey Civil Rights Act ("NJCRA"). Because Plaintiff's federal claims fail as a matter of law, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## I.   BACKGROUND[1]

This case involves the use of force against Plaintiff Bernard Wurtzbacher, who re-injured his surgically repaired shoulder when officers Gauntt and Rausch stopped his distinctive car and arrested him. The events began when a brazen robber, Katie Wilson, exploited Plaintiff's kindness and duped him into making his vehicle her "getaway" car. This, unfortunately, made

---

[1] In addition to the relevant record evidence, the facts are drawn from the parties' Statements of Material Facts ("SMF") where the parties admit the facts asserted. Disputed facts are noted accordingly.

the officers believe that Plaintiff was involved in the armed robbery and also a rape. The events unfolded as follows.

### A. Plaintiff Helps a Distressed Pedestrian

Around noon on May 1, 2016, Plaintiff and his wife, Kathleen Wurtzbacher, were driving to the Camden Aquarium in their yellow Nissan Xterra. (Defs.' SMF at ¶¶ 8–10.) Because two months prior, Plaintiff had surgery to repair his right rotator cuff, his wife drove the car. (Pl.'s Dep., Pl.'s Ex. A, Defs.' Ex. B, at 32:23–33:2; *see also* Rep. of Dr. Martin Riss, Pl.'s Ex. B at 1, Feb. 5, 2018.) Plaintiff is a large white man who weighs about 200 pounds. (Pl.'s Dep. at 54:5–7.) According to his wife, Plaintiff is an HVAC technician and dressed as if he was going to work on the day in question, hanging a flashlight and a knife from his pocket. (Kathleen Wurtzbacher, Video Statement, Defs.' Ex. D at 15:20–16:55.)

While in Winslow Township, Plaintiff and his wife noticed a female running in the road, waiving her hands in the air, yelling for help, and being chased by another person. (Defs.' SMF at ¶¶ 16–17.) Plaintiff's wife pulled the vehicle over and Plaintiff exited the front passenger side seat to let the woman in the backseat. (*Id.*) As Plaintiff and his wife drove away towards a nearby Wawa with the woman in tow, the unidentified female passenger stated that the man was "going to rape her." (*Id.* at ¶¶ 17–18, 20.)

### B. Dispatch to Police Officers

Plaintiff then called 9-1-1 and explained that the woman was running, claimed that she was "being raped," and that they would meet responding officers at Wawa. (*Id.* at ¶¶ 21–22.) The operator instructed Plaintiff to wait for the police at the Wawa. (*Id.* at ¶ 23.)

Unbeknownst to Plaintiff and his wife, the woman that they just picked up had robbed a gas station at knifepoint and was fleeing the scene. (*Id.* at ¶¶ 19, 27.) As reflected in the Master Incident Report, the robbery victim described the perpetrator as a "white male." (*Id.* at ¶ 27.)

According to recordings from Central Dispatch, a witness identified the yellow Nissan as being involved in the armed robbery, stating that "they stole money and pulled off," and that "the car who robbed the guy pulled off." (*Id.* at ¶ 26.)

As Gauntt and Rausch began responding to the armed robbery, dispatch advised them that Plaintiff's yellow Nissan was involved. (*Id.* at ¶¶ 26, 28; Pl.'s SMF at ¶ 38.) Dispatch also relayed to Gauntt and Rausch that a male committed the armed robbery and fled in the Nissan. (Gauntt's Resp. to Pl.'s Interrog., Pl.'s Ex. E at No. 6; Rausch's Resp. to Pl.'s Interrog., Pl.'s Ex. H at No. 6.) While en route to the scene, dispatch provided Gauntt and Rausch additional information from another call that Plaintiff's yellow Nissan was involved in a rape. (Defs.' SMF at ¶ 29; Pl.'s SMF at ¶ 38.)

### C. Vehicle Stop and Officers' Commands

While waiting in the Wawa parking lot, the female occupant became upset and asked Plaintiff and his wife to take her to either her or her girlfriend's house. (Defs.' SMF at ¶ 30.) Plaintiff and his wife then contacted 9-1-1 to advise that they were leaving the Wawa. (*Id.* at ¶ 32.)

Rausch then spotted Plaintiff's yellow Nissan and pulled it over by the roadside's grass. (*Id.* at ¶¶ 33–34; Pl.'s Dep. at 45:9–21.) Officer Gauntt followed behind in his own vehicle. (Defs.' SMF at ¶ 34.) Gauntt testified that as he and Rausch arrived at the scene, he believed that the person "doing either the robbery, the rape or both" was "in that vehicle." (Gauntt Dep., Pl.'s Ex. F, Defs.' Ex. F, at 18:7–17.)

From their vehicles about fifteen to twenty feet away, Gauntt and Rausch drew their weapons and commanded the driver—Plaintiff's wife—to shut off and exit the vehicle. (Gauntt Dep. at 22:2–17; *see also* Defs.' SMF at ¶ 35.) Gauntt testified that he drew his weapon "because of the report of the armed robbery." (Gauntt Dep. at 22:1–11.) After Plaintiff's wife

complied with the commands and walked backwards towards the officers with her hands in the air, the officers placed her in the back of Gauntt's vehicle. (Defs.' SMF at ¶¶ 36–37, 39.) Plaintiff's wife testified that as she went into the car, she said to the officers, "[p]lease don't hurt my husband." (Kathleen Wurtzbacher Dep., Pl.'s Ex. C, Defs.' Ex. C, at 26:5–8; Pl.'s Resp. to Defs.' SMF at ¶ 57.) Meanwhile, Plaintiff remained on the phone with 9-1-1. (Defs.' SMF at ¶ 41.) Plaintiff testified that he remained on the phone with 9-1-1 because he was "trying to explain to them what was going on" so that dispatch "could relay the information to the police officer." (*Id.* at ¶ 54.)

After securing Plaintiff's wife in his vehicle, Gauntt again drew his weapon and began ordering the front passenger—Plaintiff—out of the vehicle. (*Id.* at ¶ 44.) Rausch drew his gun and did the same. (Rausch Dep., Pl.'s Ex. I, Defs.' Ex. E, at 22:3–15.) Gauntt and Rausch testified that they ordered Plaintiff out of the car "several" and "numerous, numerous times," without compliance. (*Id.* at 22:23–25; Gauntt Dep. at 25:3–9.) Thus, the officers moved closer to the vehicle and banged on the back fender to get Plaintiff's attention. (Defs.' SMF at ¶ 45.) As Gauntt neared the front passenger side door, Rausch noticed an additional passenger—the woman—in the backseat. (*Id.* at ¶¶ 46–47.) Plaintiff testified that at this point, he was sitting with his legs out of the passenger side, still on the phone with 9-1-1. (*Id.* at ¶ 48.) Plaintiff testified that he may have opened the door on his own, but does not fully recall why he opened the door to sit like that. (Pl.'s Dep. 47:7–48:4.)

Plaintiff testified that the officers, who were now by him on the front passenger side, were "yelling and forceful" and told him to exit the vehicle. (*Id.* at 48:5–49:6; *see also* Defs.' SMF at ¶¶ 49–50.) Plaintiff stated that he tried to explain what had occurred to the officers but they did not want to speak with him. (Pl.'s SMF at ¶ 13.) Ronald Lombardo, an off-duty police

officer who observed most of the events from his shop directly across the street, testified that an officer "was yelling for the gentleman to get out of the vehicle" between two and four times. (Defs.' SMF at ¶¶ 42–43, 51–52.)  Plaintiff's wife also testified that she heard the officers tell Plaintiff to exit the vehicle, and in her post-incident video statement, stated that Plaintiff "did not comply" in exiting the vehicle, though she could not recall what she meant by that statement when asked in her deposition.  (Kathleen Wurtzbacher Dep. at 26:16–28:9; Defs.' Resp. to Pl.'s SMF at ¶ 27.)  In Rausch's eventual report of the incident, he stated that the vehicle's door was open, making him believe that it was "possible for all occupants to hear our commands."  (Rep. of James Rausch, Pl.'s Ex. G at 4.)

Plaintiff admitted that although the officers were yelling and forceful in ordering him to exit the vehicle, he did not exit when they first asked.  (Pl.'s Dep. at 49:1–6; *see also* Pl.'s Resp. to Defs.' SMF at ¶ 53.)  Gauntt testified that it was possible that Plaintiff did not hear his "several" orders to exit the vehicle because he was some distance away when he began issuing them, and because as he got closer, Plaintiff was on the phone and stated, "I'm on the phone with your people."  (Gauntt Dep. at 25:3–26:4; Pl.'s SMF at ¶ 44.)  When asked how much time elapsed between the officers' first and last command to exit the vehicle, Lombardo testified that it was "quick."  (*Id.* at ¶ 62.)

### D.  Plaintiff's Arrest

The parties agree that after Plaintiff did not exit the vehicle, he was pulled out of the car and subsequently handcuffed on the ground.  (*Id.* at ¶ 14; Defs.' SMF at ¶ 59.)  Their accounts diverge, however, on some of the particulars.

According to Plaintiff, he stood up, and as he stood, one officer reached into his vehicle, grabbed one of his arms, and pulled him out of the car.  (Pl.'s Dep. at 51:24–52:23.)  Plaintiff testified that he was then "taken down" face first "by two officers."  (*Id.* at 52:20–25.)  Plaintiff

testified that while on the ground, he was handcuffed "in the front," but could not recall if the officers used two sets of handcuffs. (*Id.* at 53:6–54:4.)

Plaintiff's wife described the events similarly, but with some differences. According to her, two officers "pulled him out of the car" by "his arms" and "threw him on the ground," and he was "yelling about his arms, not to put them all the way back." (Pl.'s SMF at ¶ 30; Kathleen Wurtzbacher Dep. at 29:10–24.) Plaintiff's wife explained that two officers were on top of Plaintiff on the ground, where they were "trying to pull his arms back." (*Id.*) But because Plaintiff's "one arm didn't go that far yet . . . they stretched it back" and "pulled his arms back" to get the handcuffs on. (*Id.*)

Gauntt and Rausch recall differently. According to Gauntt, he was the officer who grabbed Plaintiff and removed him from the car. (Defs.' SMF at ¶ 57.) In his report on the matter, Gauntt stated that he "grabbed [Plaintiff] by the front of his shirt and physically removed him from the seat and placed him on the ground." (Rep. of Robert Gauntt, Pl.'s Ex. D at 6; Pl.'s SMF at ¶ 32.) In his interrogatory responses, Gauntt stated that he "grabbed [Plaintiff] by his arm, removed him from the vehicle, placed him on the ground and handcuffs were applied." (Pl.'s SMF at ¶ 34.) Gauntt testified that he merely "put" Plaintiff—a large man—on the ground; he did not throw him. (Gauntt Dep. at 27:22–28:16.) Gauntt also testified that from what he recalled, Rausch did not assist in any way with handcuffing Plaintiff, though he was in the immediate vicinity to ensure Plaintiff did not resist or fight. (*Id.* at 28:25–29:13.) Rausch, by contrast, indicated in his incident report that as Gauntt grabbed Plaintiff and took him to the ground, Rausch opened the back passenger door to cover that subject. (Rep. of James Rausch at 4.) Rausch's report further noted that Gauntt "was able to get [Plaintiff's] one hand cuffed," but Rausch "had to assist him with getting the subject's other hand behind his back to secure him."

(*Id.*)  Both officers stated that Plaintiff was secured with two sets of handcuffs.  (*Id.*; Defs.' SMF at ¶ 60.)

For his part, Valentino stated that he arrived on scene as Gauntt removed Plaintiff from the vehicle.  (Defs.' SMF at ¶ 62.)  According to Rausch's report, when Valentino arrived on the scene, he proceeded to secure the yellow Nissan's back passenger, later identified as the true robbery suspect, Katie Wilson.  (Rep. of James Rausch at 4–5.)

Plaintiff's encounter with the officers unfolded quickly.  Plaintiff estimated that five to six minutes elapsed from the time when the officers stopped his vehicle to the time when they handcuffed him.  (Pl.'s Dep. at 54:11–18.)  According to Gauntt, "[f]rom the time plaintiff was placed on the ground until handcuffs were applied, less than 30 seconds elapsed."  (Pl.'s SMF at ¶ 35.)  Rausch stated the same.  (Rausch's Resp. to Pl.'s Interrog. at No. 11.)  Plaintiff estimated that about three minutes elapsed between the time he was removed from the vehicle and eventually put into a police vehicle.  (Pl.'s Dep. at 54:11–14.)

### E.  Plaintiff's Shoulder Injury

Plaintiff re-injured his surgically repaired shoulder in the course of his arrest.  After the incident, Plaintiff visited Dr. Martin Riss, who opined that Plaintiff aggravated his prior right shoulder condition, suffering a right shoulder sprain, complete right shoulder infraspinatus and supraspinatus tears, and a right biceps tendon tear with a SLAP tear.  (Pl.'s SMF at ¶ 17.)  According to Dr. Riss, these injuries are "permanent in nature" and are "casually related to his arrest and handcuffing."  (*Id.* at ¶ 18.)

Plaintiff, however, did not attribute his injuries to the entire "arrest" or even his handcuffing.  (Defs.' SMF at ¶ 58; Pl.'s SMF at ¶ 16.)  Instead, Plaintiff testified that he heard a "pop" and felt pain in his shoulder between the time officers grabbed and pulled him from the car and his "way down" to the ground; the "pop," he explained, was not from the force of hitting

the ground or his handcuffing, but potentially caused by the officers' actions in grabbing him. (Pl.'s Dep. at 56:8–57:10.)

During the course of events with the officers, Plaintiff also made statements about or relating to his shoulder. Plaintiff's wife testified, for example, that as the officers threw him to the ground, he "was yelling about his arms, not to put them all the way back." (Pl.'s Resp. to Defs.' SMF at ¶ 57.) In his report, Gauntt stated that "[a]s I was attempting to handcuff [Plaintiff] behind his back he advised me that he recently had shoulder surgery and due to this he was cuffed using two pairs of handcuffs behind his back." (*Id.*) In his interrogatories, Gauntt explained that he grabbed Plaintiff by his arm, removed him from the vehicle, placed him on the ground, applied handcuffs, and "[p]rior to placing handcuffs on him, either the plaintiff or his wife had indicated that he had some sort of shoulder issue." (*Id.*) In his deposition testimony, Gauntt stated that "somewhere prior to me taking [Plaintiff] out of the vehicle and handcuffing him," either Plaintiff or his wife advised him that he had "some shoulder injury or pain" and was thus aware of "something with his shoulder." (*Id.*; Gauntt Dep. at 22:25–23:19.) Gaunt also testified that it was "possible" that Plaintiff advised him of "some shoulder injury" before Gauntt handcuffed him. (*Id.* at 28:18–29:18; Pl.'s Resp. to Defs.' SMF at ¶ 57.) As for Rausch, he testified that he could not remember if Plaintiff or his wife indicated that Plaintiff had a shoulder "issue" before they pulled him from the car. (*Id.*; Rausch Dep. at 30:6–31:18.)

### F. Aftermath and This Case

Eventually, the officers transported Plaintiff to the police station. (Defs.' SMF at ¶ 63.) There, officers removed his handcuffs "pretty quick." (*Id.* at ¶ 66.) Ultimately, Gauntt charged Plaintiff with obstructing the administration of law under N.J.S.A. § 2C:29-1(a) and resisting arrest under N.J.S.A. § 2C:29-2(a) because Plaintiff did not comply with commands to exit the

vehicle and because Plaintiff had to be physically removed from it. (Pl.'s SMF at ¶ 47.) The charges were administratively dismissed. (Defs.' SMF at ¶ 69.)

Plaintiff then filed this suit, bringing ten claims for violations of the federal and state constitutions and related state laws. (Doc. No. 3 ("Am. Compl.").) Specifically, Counts I through VII allege federal constitutional violations under Section 1983. In Count I, Plaintiff alleges that Gauntt, Rausch, and Valentino used excessive force on him. (*Id.*) In Count II, Plaintiff claims that Gauntt, Rausch, and Valentino failed to intervene to prevent constitutional violations. (*Id.*) In Count III, Plaintiff alleges that Robert Stimelski—the former Winslow Township Chief of Police who retired two months before this incident—is liable on a theory of "supervisory liability" because he either directed or had knowledge of and acquiesced to his subordinates' actions in violating Plaintiff's constitutional rights. (*Id.*; Defs.' SMF at ¶ 5.) In Count IV, Plaintiff claims that Gauntt, Rausch, and Valentino conducted an "illegal search/seizure." (*See* Am. Compl.) In Count V, Plaintiff alleges that Gauntt, Rausch, and Valentino falsely arrested and imprisoned him "without probable cause." (*Id.*) In Count VI, Plaintiff alleges that Gauntt, Rausch, and Valentino are liable for malicious prosecution. (*Id.*) And in Count VII, Plaintiff brings a *Monell* claim against Winslow Township and former Chief Stimelski. (*Id.*)

Counts VIII through X are related state law claims. In Count VIII, Plaintiff alleges that based on their above actions, Gauntt, Rausch, and Valentino violated his state constitutional rights under the NJCRA. (*Id.*) Finally, in Counts IX and X, Plaintiff alleges that Gauntt, Rausch, and Valentino committed assault, battery, and negligent acts under New Jersey law. (*Id.*) Defendants now move for summary judgment on Plaintiff's claims. (Doc. No. 22 ("Defs.' Br.").) Plaintiff opposes in part. (Doc. No. 27 ("Pl.'s Br.").)

## II.    LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it will "affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if a "reasonable jury could return a verdict for the nonmoving party."  *Id.*  The movant bears the burden of showing the absence of a "genuine issue of material fact."  *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996).  The party may satisfy its burden by "produc[ing] evidence showing the absence of a genuine issue of material fact" or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the movant makes this showing, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the nonmovant must "point to concrete evidence in the record that supports each and every essential element of his case."  *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995).  "When opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"  *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002).  The Court's role is not to weigh the evidence and decide the truth, but to determine if there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In making that decision, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party," *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998), and credibility

determinations are for the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

Of Plaintiff's ten claims against the various Defendants, none survive summary judgment. The Court addresses each in turn, analyzing Plaintiff's Section 1983 and NJCRA claims together, as they fail for the same reasons. *See Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443–44 (D.N.J. 2011) (interpreting the NJCRA and Section 1983 analogously).

### A. Excessive Force (Counts I and VIII)

In Counts I and VIII, Plaintiff asserts that Gauntt, Rausch, and Valentino used excessive force against him under Section 1983 and the NJCRA. (Pl.'s Br. at 4–12). Gauntt, Rausch, and Valentino seek summary judgment, claiming that their actions were objectively reasonable and that they are entitled to qualified immunity. (Defs.' Br. at 7–10, 16–18.) Plaintiff, by contrast, contends that genuine disputes of material fact prevent summary judgment. (Pl.'s Br. at 4–12.)

The doctrine of qualified immunity shields government officers from civil liability under Section 1983 "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The analysis has two steps, which courts may decide in either order. *See Giles v. Kearney*, 571 F.3d 318, 325 (3d Cir. 2009) (citing *Pearson*, 555 U.S. at 232). At the first step, courts "decide whether the facts . . . make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232. At the second step, courts "decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* If the answer to either question is "no," immunity shields a defendant. *Pitman v. Ottehberg*, No. 10-cv-2538, 2015 WL 6445872, at *6 (D.N.J. Oct. 23, 2015) (citations omitted).

At summary judgment, qualified immunity is a question of law but is precluded by genuine disputes of material fact. *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002). Here, the undisputed facts show that Gauntt, Rausch, and Valentino are entitled to judgment as a matter of law.

### 1. Excessive Force Against Valentino

Plaintiff appears to abandon any excessive force claim against Valentino. Although Plaintiff includes Valentino as a defendant in Counts I and VIII, Plaintiff directs the Court to no evidence to show how Valentino used excessive force against him. Indeed, Plaintiff's arguments are focused entirely on the "force utilized by Defendants Gauntt and Rausch." (Pl.'s Br. at 4.) Plaintiff also chose not respond to Valentino's argument that he was "not involved in removing Plaintiff from his vehicle." (Defs.' Br. at 9 n.2.) Accordingly, the Court grants summary judgment to Valentino on the excessive force claims against him. *See Sanders v. Cty. of Camden*, No. 15-cv-1129, 2017 WL 3332056, at *14 (D.N.J. Aug. 4, 2017) (granting summary judgment when the plaintiff appeared to abandon a claim by making no argument on the issue in opposition to a motion for summary judgment).

### 2. Excessive Force Against Gauntt and Rausch

As to Gauntt and Rausch, Plaintiff claims that they used excessive force against him when they both pulled him out of the car and proceeded to handcuff him on the ground. (Pl.'s Br. at 7.) Although the officers claim that only Gauntt pulled Plaintiff from the car and their accounts diverge on whether Rausch assisted Gauntt in handcuffing Plaintiff, Plaintiff alleges that both took him to the ground and pulled his arms back to handcuff him. (*E.g.*, Pl.'s SMF at ¶¶ 14–15.) Because at this stage, the Court must view the facts in the light most favorable to Plaintiff, which, in this qualified immunity case, usually means "adopting . . . the plaintiff's version of the facts," *Scott v. Harris*, 550 U.S. 372, 378 (2007), the Court's analyzes Plaintiff's

excessive force claims as if his version of events is correct. Yet qualified immunity still shields Gauntt and Rausch.

### a. No Constitutional Violation

Excessive force claims are analyzed under the Fourth Amendment's objective "reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). Although reasonableness is often a factual question, summary judgment is appropriate "if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (citation omitted). In making that determination, courts consider the totality of the circumstances, judged "from the perspective of the officer at the time of the incident and not with the benefit of hindsight." *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015). The calculus must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

In assessing the totality of the circumstances, courts may consider "all of the relevant facts and circumstances leading up to the time that the officers allegedly used excessive force," not just the facts and circumstances at the "precise moment that excessive force is applied." *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004). Under *Graham*, relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Other relevant factors include "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at

one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). Courts may also consider whether the "physical force applied was of such an extent as to lead to injury." *Id.*

Here, Plaintiff argues that Gauntt and Rausch used excessive force against him because they both pulled him out of the car by his arms, took him to the ground face first, and stretched his arms behind his back even though he was yelling not to pull his arms. (Pl.'s Br. at 7.)[2] Plaintiff supports his claim by arguing that Gauntt and Rasuch knew of his shoulder surgery *before* they pulled him from the car, took him to the ground, and attempted to handcuff him. (Pl.'s Br. at 7, 11; *see also* Pl.'s SMF at ¶ 58.) Yet the officers are entitled to summary judgment for at least three reasons.

First, Plaintiff's evidence does not support his claim, either because it fails to show that Gauntt and Rausch knew of Plaintiff's recent *surgery* or that they knew of it *before* they pulled him out of the car. Plaintiff cites, for example, his wife's testimony that she said to the officers, "[p]lease don't hurt my husband." (Kathleen Wurtzbacher Dep. at 26:5–8; Pl.'s Resp. to Defs.' SMF at ¶ 57.) But this vague statement does not support Plaintiff's theory because it did not inform the officers of any injury to any part of Plaintiff. Nor has Plaintiff adduced any evidence to show that he displayed obvious signs of his injury, like a sling, that could potentially contextualize this statement.

---

[2] To the extent Plaintiff argues that the officers used excessive force and aggravated his shoulder by *throwing* him to the ground and *pulling his arms back to handcuff him* too violently, such claims are seemingly contrary to Plaintiff's own testimony. Plaintiff testified, for example, that he heard the "pop" and felt pain in his shoulder between the time the officers grabbed and pulled him from the car and his "way down" to the ground; the "pop," he explained, was not from the force of hitting the ground or his handcuffing, but potentially caused by the officers' actions in grabbing him. (Pl.'s Dep. at 56:8–57:10.) Thus, Plaintiff's testimony suggests that the main issue here is whether the officers' actions in grabbing Plaintiff to remove him from the vehicle were objectively reasonable under the circumstances. But to the extent Plaintiff's evidence could support claims that the officers threw him down and pulled his arms back to handcuff him with excessive force, the analysis below accounts for them. And they fail for the same reasons that follow.

Plaintiff also cites Gauntt's interrogatories, in which he stated that he grabbed Plaintiff's arm, removed him from the car, placed him on the ground and applied handcuffs, but "[p]rior to placing handcuffs on him, either [Plaintiff] or his wife had indicated that he had some sort of shoulder issue." (Pl.'s Resp. to Defs.' SMF at ¶ 57.) Again, this statement does not support Plaintiff's claim because: (1) it does not indicate that any officer knew specifically of Plaintiff's shoulder *surgery*—as opposed to a vague shoulder issue; and (2) it suggests that Gauntt learned of that issue *contemporaneous with or just before* the attempted handcuffing, not, as Plaintiff suggests, before the officers grabbed him from the car. This is consistent with Gauntt's report. Contrary to Plaintiff's claim, Gauntt stated in his report that "[*a*]*s I was attempting to handcuff* [Plaintiff] behind his back, he advised me that he had recently had shoulder surgery and due to this he was cuffed using two pairs of handcuffs behind his back." (Pl.'s Resp. to Defs.' SMF at ¶ 57 (emphasis added).) And in his deposition, Gauntt similarly indicated that based on a statement either by Plaintiff or his wife, he was simply aware of "something with [Plaintiff's] shoulder" before "taking him out of the vehicle and handcuffing him." (*Id.*; Gauntt Dep. at 22:25–23:19.)

Plaintiff's reliance on other statements from Gauntt and Rausch also fail to create a genuine dispute of material fact as to their knowledge of Plaintiff's shoulder surgery before they pulled him from the car. At this stage, Plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Yet that is all Plaintiff does in citing Gauntt's testimony that it was "possible" that Plaintiff told him that he had a "shoulder injury" before he handcuffed Plaintiff and Rausch's testimony that he could not remember if Plaintiff's wife advised them of Plaintiff's shoulder issue before they removed Plaintiff from the car. (Pl.'s Resp. to Defs.' SMF at ¶ 57.)

In similar cases within the Third Circuit, courts have granted summary judgment to an officer when, as here, the plaintiff provided no evidence to suggest that the officer knew of the non-compliant plaintiff's shoulder surgery before applying force to his arm, and when, as here, the plaintiff displayed no obvious signs of the surgery such that the officer should have known of it. *See Albert v. Weaver*, No. 05-cv-2380, 2007 WL 2343830, at *7, n.9 (M.D. Pa. Aug. 15, 2007) (granting summary judgment to officer because the plaintiff, who wore no sling, "presented no evidence that, at the time [he] was removed from the building" after "not immediately complying" with the request to leave, the officer "knew or should have known of the recent surgery to his arm, such that grasping the adult male by his arm and lifting upward to carry [the plaintiff] out of the precinct would cause him injury"). In fact, on Plaintiff's version of events, the officers here justifiably used more force than the officer's arm grasp in *Albert*, for they reasonably suspected Plaintiff of far more serious offenses than the plaintiff in *Albert*. *See id.* at *1, *7 (plaintiff did not comply with requests to leave the precinct after an interview regarding his son's involvement in alleged vandalism).

Moreover, Plaintiff's evidence differs from the evidence that courts have found to create a genuine issue of material fact in similar cases. Unlike here, the plaintiffs in those cases adduced evidence that the officers knew specifically of the *surgery* before using force. *Id.* at *8 (denying summary judgment to second officer who grabbed the plaintiff's other arm because "[u]nlike [the first officer] who was unaware of [the plaintiff's] surgery until after the fact, [the plaintiff] has introduced evidence that he informed [the second officer] of his surgery at the very beginning of their meeting"); *Klemash v. Monroe Twp.*, No. 07-cv-4190, 2010 WL 455263, at *2, *7 (D.N.J. Feb. 4, 2010) (denying summary judgment to the officer who apprehended the

plaintiff by ripping his arm behind his back and throwing him to the ground when the plaintiff told the officer, before the officer applied force, that he "just went through therapy and surgery").

The plaintiffs who avoided summary judgment also presented evidence that the officers knew of other facts to corroborate the plaintiff's surgery. *See Albert*, 2007 WL 2343830, at *8 (denying second officer's motion for summary judgment because in addition to knowing of the surgery, the plaintiff "also presented evidence that he complained of pain to his right arm when [the second officer] allegedly accosted him" during a preceding interaction); *Klemash*, 2010 WL 455263, at *2, 7 (denying officer's motion for summary judgment because the plaintiff requested to show his scar, have the officer call his doctor, and the plaintiff's girlfriend told the officer that the plaintiff's arm was "fused" from "surgery"). Here, however, Plaintiff cites no evidence to suggest that the officers had information that could potentially corroborate Plaintiff's subjective claims of injury; nor does his wife's vague statements to the officers help confirm his claims as did the girlfriends' in *Klemash*. The Court also notes that the officers here reasonably suspected Plaintiff of far more serious offenses than the plaintiff in *Klemash*. *See id.* at *7 ("The crime at issue, a disorderly person violation, predicated on the use of a curse word, was certainly not 'severe.'").

The second reason Plaintiff's claim fails is because Gauntt and Rasuch were not required to credit Plaintiff's uncorroborated statements about his shoulder or arms. As other federal courts have stated, "a police officer need not credit everything a suspect tells him . . . especially . . . when the officer is in the process of handcuffing a suspect." *Secondo v. Campbell*, 327 F. App'x 126, 132 (11th Cir. 2009) (quoting *Rodriguez v. Farrell,* 294 F.3d 1276, 1278 (11th Cir. 2002)). Indeed, "statements by suspects claiming (at the time of their arrest) to have pre-existing injuries are, 'no doubt, uttered by many suspects who, if given the choice, would prefer not to be

handcuffed at all and, if they must be restrained in that manner, would prefer that the handcuffs be in front.'" *Rodriguez,* 294 F.3d at 1278 (quoting *Caron v. Hester*, No. 00-cv-394, 2001 WL 1568761, at *8 (D.N.H. Nov. 13, 2001). Thus, Plaintiff does little to suggest that the officers acted unreasonably by relying on Gauntt's report, interrogatories, and his own alleged pleas to the officers not to pull his arms back as they were on top of him. Again, Plaintiff adduced no evidence to show that he displayed obvious signs of his surgery or that the officers knew of other corroborating facts such that officers could more reasonably be expected to credit his statements.[3]

Finally, Plaintiff's claim fails because on the facts he established—that the officers knew merely of his unspecified shoulder issue when they grabbed him from the car and proceeded to throw and handcuff him as alleged—the officers' conduct was objectively reasonable under the factors set forth in *Graham.* Contrary to Plaintiff's suggestion that the crime at issue was not severe because Plaintiff was charged only with obstructing the administration of the law and resisting arrest, (Pl.'s Br. at 7), Gauntt and Rausch responded to reports that Plaintiff's yellow Nissan was involved in two violent felonies—an armed robbery and rape. Because the officers reasonably suspected Plaintiff of these serious crimes (and drew their guns accordingly), they could reasonably conclude—in the rapidly evolving moments by the car—that Plaintiff was armed and posed an immediate threat to their safety, particularly once Plaintiff failed to comply

---

[3] To be sure, under these cases, officers need not credit statements by a suspect, and here, Gauntt's interrogatories and deposition testimony leave open the possibility that Plaintiff's wife stated that Plaintiff had a "shoulder issue." But to the extent the officers discounted such statements and applied force to Plaintiff, their conduct was objectively reasonable given the absence of obvious signs of his injury and the rapidly evolving circumstances surrounding their pursuit of a person ignoring commands and suspected of two violent crimes.

with their forceful commands to exit his vehicle.[4]  Plaintiff admits that he did not exit his car and does not present evidence to contradict the officers' claims (which Lombardo corroborated) that they ordered him out several times.  Whether Plaintiff heard the commands because he was on the phone with 9-1-1 or for any other reason is irrelevant to the officers' reasonable belief that Plaintiff did not comply as commanded.

Other *Graham* factors also weigh for the officers, including the duration of the action—which occurred in the context of effecting arrest—as the officers removed Plaintiff from the car and handcuffed him in under thirty seconds.  The officers also had to contend with the car's other passenger.  And for the reasons above, the injury to Plaintiff's shoulder—while unfortunate—does not preclude a finding that the officers' conduct was objectively reasonable.  In short, in the context of this case, the officers acted reasonably by—and were not required to forgo—apprehending Plaintiff and pulling his arms in the manner that he alleges.

Plaintiff's remaining arguments are based on facts that are not material to the analysis here.  Plaintiff argues, for example, that he only drank one alcoholic beverage before encountering police, that the officers did not want to speak with him when he tried to explain the situation to them, and that his wife immediately pulled over and complied with commands to exit the car.  (Pl.'s Br. at 5–8.)  Thus, immunity shields Gauntt and Rausch as a matter of law.

### b.  No Violation of Clearly Established Law

Even if the officers' actions were not objectively reasonable, Gauntt and Rausch are still entitled to qualified immunity because they did not violate Plaintiff's "clearly established" rights.  To be clearly established, a right must be sufficiently clear at the time of the challenged conduct

---

[4] The Court notes that although the record does not make clear whether or when the officers observed a knife on Plaintiff in the course of their interaction, Plaintiff's wife indicated in her video statement that Plaintiff hung one from his pocket.  Of course, this is the same weapon used by the reportedly male suspect in the armed robbery.  Neither party raises or discusses this fact.

that "every reasonable official would have understood that what he [was] doing violates that right." *Davenport v. Borough of Homestead*, 870 F.3d 273, 281 (3d Cir. 2017) (citation omitted). "That is, in the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited?" *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002). Although there need not be a case directly on point, existing precedent must place the constitutionality of the defendant's conduct "beyond debate." *Mullenix*, 136 S. Ct. at 308. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Thus, contrary to Plaintiff's broad and general framing of the issue, (Pl.'s Br. at 11), the specific question here is whether, on May 1, 2016, the law clearly established that officers violate the Fourth Amendment rights of a man that they reasonably believe is ignoring their commands and involved in two violent felonies when the officers grab him, throw him to the ground, and attempt to restrain him by pulling or stretching his arms back despite their knowledge that the suspect has an unspecified and invisible shoulder issue. The Court finds that it did not, and Plaintiff directs the Court to no contrary cases.

To the extent Gauntt's report suggests that he or Rausch knew more specifically of Plaintiff's shoulder surgery when they apprehended Plaintiff and pulled back his arms, they still did not violate clearly established law. As discussed above, Gauntt's report indicates that any such information was learned during the course of handcuffing. As two federal appellate courts have stated, "[w]e are aware of no case . . . where a court held that ignoring an uncooperative suspect's claim of *invisible* injury (such that handcuffing could be harmful) made during the

course of handcuffing constituted excessive force." *Hunt v. Massi*, 773 F.3d 361, 370 (1st Cir. 2014) (quoting *Beckles v. City of N.Y.*, 492 F. App'x 181, 183 (2d Cir. 2012)); *see also Caron*, 2001 WL 1568761, at *10 (D.N.H. Nov. 13, 2001) (finding that it was not "clearly established" that police officers "use unlawful and excessive force when they handcuff a suspect behind the back, notwithstanding the suspect's unsupported claim to suffer from an injury that either prevents, or would be exacerbated by, such conduct"). Again, Plaintiff directs the Court to no contrary cases.

While the Court regrets that these unfortunate events have impacted Plaintiff, his wife, and left him injured, the officers' actions in this case do not constitute the kind of plain incompetence that warrants denying them qualified immunity. *Mullenix*, 136 S. Ct. at 308. Accordingly, and for this additional reason, immunity shields Gauntt and Rausch from Plaintiff's excessive force claims.

### B.  Failure to Intervene (Count II and VIII)

Next, Plaintiff brings failure to intervene claims against Gauntt, Rausch, and Valentino. Although Plaintiff does not oppose granting summary judgment to Valentino (Pl.'s Br. at 1), Plaintiff cannot maintain these claims against any defendant. A failure to intervene claim is cognizable when an officer "fails or refuses to intervene when a constitutional violation . . . takes place in his presence." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). But as explained above, no constitutional violation occurred here. Thus, the Court grants summary judgment to Gauntt, Rausch, and Valentino on Count II and the NJCRA companion claim in Count VIII.

### C.  Supervisory Liability (Count III)

Plaintiff does not oppose granting summary judgment to Stimelski on Plaintiff's supervisory liability claim. (Pl.'s Br. at 1.) Thus, the Court grants him summary judgment. *See Sanders*, 2017 WL 3332056, at *14.

**D. Illegal Search/Seizure and False Arrest/Imprisonment (Counts IV, V, and VIII)**

In Count IV, Plaintiff alleges that Gauntt, Rausch, and Valentino unlawfully searched and seized him without probable cause under Section 1983. In Count V, Plaintiff similarly alleges that Gauntt, Rausch, and Valentino falsely arrested and/or imprisoned him without probable cause. In Count VIII, Plaintiff brings the same claims under the NJCRA.

Before addressing the merits of these claims, the Court notes that their contours are unclear. Although Count V is titled "false arrest/imprisonment," Plaintiff makes no "false imprisonment" arguments on summary judgment. Plaintiff does not even allege when or how he believes he was falsely imprisoned, lest mention false imprisonment in any of his filings. Instead, Plaintiff makes arguments only as to false arrest. (Pl.'s Br. at 14–16.) Thus, the Court finds that Plaintiff has abandoned any false imprisonment claim, and, at this stage, construes Count V to assert a false arrest claim only. Any un-abandoned false imprisonment claim, however, fails for the same reasons below.

Count IV's contours are similarly unclear. Although Plaintiff titles Count IV as "illegal search/seizure," he directs the Court to no evidence of any "search" and makes seizure arguments only. (Pl.'s Br. at 14–16.) In fact, Plaintiff concludes his brief by claiming that he met his summary judgment burden to show that he was "falsely arrested and illegally seized," again making no mention of any search. (Pl.'s Br. at 14–16, 20.) Thus, the Court finds that Plaintiff has abandoned any illegal search claim, and, at this stage, construes Count IV to assert an unlawful seizure claim only.

That, however, begs the question of when Plaintiff believes that he was "seized," another unclear position. "A seizure occurs in one of two situations: (1) when officers apply physical force to the person being seized, or (2) when force is absent, where officers make a show of authority and the person seized submits to the show of police authority." *United States v.*

22

*Samuels*, 131 F. App'x 859, 862 (3d Cir. 2005); *see also United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015). Here, Plaintiff could believe that he was seized at multiple junctures, beginning with when the officers pulled him over and drew their guns, as Plaintiff may believe he submitted to that show of authority. *See Samuels*, 131 F. App'x at 862 ("When the officers . . . took out their guns . . . at that point, a show of authority existed."). More obviously, Plaintiff could believe that he was "seized" when the officers physically grabbed him in the car, threw him to the ground, and handcuffed him by his car. Giving Plaintiff the benefit of every inference, the Court takes up both possibilities here and proceeds to the merits of Counts IV, V, and their NJCRA counterpart in Count VIII.

Claims for illegal seizure and false arrest (as well as false imprisonment) require the absence of probable cause. *Bradley v. Kuntz*, 655 F. App'x 56, 59 n.2 (3d Cir. 2016) (false imprisonment and illegal seizure); *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (false arrest). Probable cause exists when "the facts and circumstances within the officer's knowledge are 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *United States v. Glasser*, 750 F.2d 1197, 1205 (3d Cir. 1984) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). For an arrest, probable cause "need only exist as to [one of the] offense[s] that could be charged under the circumstances." *Fennimore v. Lower Twp.*, No. 09-cv-2090, 2011 WL 1705599, at *7 (D.N.J. May 4, 2011) (quoting *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994)). Although the question of probable cause is generally one for the jury, *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998), courts may "conclude 'that probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding,' and may enter

summary judgment accordingly." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788–89 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)).

Here, the officers had probable cause to seize Plaintiff in and by his car because they responded to reports of an armed robbery and rape knowing that they both involved Plaintiff's yellow Nissan. Dispatch also informed the officers that the armed robbery suspect was a male—like Plaintiff, the only male in the car—and Plaintiff did not exit the car when commanded. Plaintiff does not dispute these facts. Thus, based on the facts known to them, the officers had probable cause to stop and seize Plaintiff in and by his car. *See Chambers v. Maroney*, 399 U.S. 42, 46–47 (1970) (holding that "the police had ample cause to stop a light blue compact station wagon carrying four men and to arrest the occupants" because the vehicle and its occupants matched the description of those suspected in an armed robbery of a service station).

The officers also had probable cause to arrest Plaintiff for obstruction.[5] Under New Jersey law, a person commits the offense of obstruction if the person "attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle." N.J.S.A. § 2C:29-1(a). The "physical interference" required to support an obstruction charge may include "failure to follow instructions of an officer," or "fail[ing] to engage in some physical conduct that causes interference." *Caronte v. Chiumento*, No. 15-cv-1828, 2018 WL 1135331, at *3 (D.N.J. Mar. 2, 2018).

Here, the officers had probable cause to arrest Plaintiff for obstruction because the undisputed facts show that Plaintiff failed to follow their forceful commands to exit his vehicle.

---

[5] Thus, the court need not analyze whether probable cause existed as to the resisting arrest charge. *See Fennimore*, 2011 WL 1705599, at *7 (quoting *Barna*, 42 F.3d at 819).

Thus, the Court grants summary judgment to Gauntt, Rausch, and Valentino. *See Caronte*, 2018 WL 1135331, at *3 (granting summary judgment to officer on false arrest and imprisonment claims because the "undisputed facts state that [the plaintiff] refused [the officer's] 'commands to exit [the] vehicle'" and "[s]uch failures to follow [the officer's] instructions established probable cause for obstruction of justice"); *Fahnbulleh v. Steneck*, No. 15-cv-5075, 2018 WL 1610692, at *6 (D.N.J. Apr. 3, 2018) (granting summary judgment because "[b]y refusing commands to open his door and instead engaging in back-and-forth about a warrant and the officer's identity," the plaintiff provided the officer with "probable cause" and "no reasonable jury [could] find otherwise"). Plaintiff's NJCRA companion claims in Count VIII fail for the same reasons.

### E. Malicious Prosecution and *Monell* Claims (Counts VI and VII)

Because Plaintiff has abandoned his malicious prosecution and *Monell* claims (Pl.'s Br. at 1), summary judgment is granted in favor of Gauntt, Rausch, and Valentino on Plaintiff's malicious prosecution claim, and in favor of Winslow Township and Stimelski on Plaintiff's *Monell* claim. *See Sanders*, 2017 WL 3332056, at *14.

### F. Remaining State Law Claims (Counts IX and X)

Finally, the Court addresses Plaintiff's remaining claims, which are state law claims for assault, battery, and negligence. But with no viable federal claims remaining in this case, the Court declines to exercise supplemental jurisdiction over them. *See Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)). Thus, Plaintiff's remaining claims are dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion is **GRANTED**, and summary judgment is entered in their favor and against Plaintiff on Plaintiff's Section 1983 and NJCRA claims. The

Court declines to exercise supplemental jurisdiction over Plaintiff's state law assault, battery, and negligence claims. An Order shall issue.

Dated: __3/18/2019_____                                   /s/ Robert B. Kugler____
                                                                                        ROBERT B. KUGLER
                                                                                        United States District Judge